I have to make a correction in the opening brief and the reply brief. I cite the Ammaline case about 47 times, and of course, as this court knows, that opinion was withdrawn, the July opinion in Ammaline. And a new opinion was entered by the same panel on a motion for reconsideration or re-hearing in February, which I call Ammaline 2. So the issue involving Blakely and Booker and Fenfen and all that. And that one's been vacated as well. Well, yes, it has. I guess it's been deferred. I don't know if that's as bad as vacated, but it's been deferred because 14. It's probably what we call shifting sands to rely on. Well, one of the interesting facts is that the petition for re-hearing in Bank in that case was joined by 14 of the U.S. attorneys. You know, to save you as much of your 20 minutes as we can, just skip over the Ammaline issue. Okay. I just wanted to. The Ammaline is pending in Bank. I assume this court knows that it's pending in Bank, and I just wanted to point that out because I've cited it a whole bunch of times. I've heard of it. Okay. I've heard of it. All right. I've heard it all three times. And we will not decide any of the Ammaline questions. I can say that with authority, until the Ammaline opinion in Bankly comes out. All right. Or anything Ammaline-related in this case, you can just skip over. All right. Let me ask the Court. There is a question being raised as to whether or not the defendant admitted the facts of the sentencing. That's not a matter of the Ammaline case. Those are facts that's pursuant to this case. I think that you probably should pursue because that is because, of course, if you admitted it, there's no Ammaline issue at all. So up to there you should go. What happens if it's a disputed fact? Right. Then that's something that Ammaline will tell us. And I have no idea what it will say. Okay. Well, what counsel is referring to in the answering brief is a couple of footnotes or references in Ammaline, which shouldn't be cited, that referred to the fact that in order to take advantage of the Sixth Amendment argument, you've got to establish that you did not admit the facts underlying the enhancements. And counsel cites briefly to the trial record and says that the restraint and the vulnerable victim facts were admitted. And he gives some quotes. I have addressed that in a reply brief. I think the position that the defendant takes is that statements made at trial, unless they are dead on point, which of course none of those statements he made were, are not the issue in terms of admission. That admission focuses not on statements made during trial, but on statements made after the pre-sentence report is filed. And facts are alleged in that, which in this case it said restraint and vulnerable victim. And whether or not the defendant dissents and files an opposition saying, hey, we disagree with the pre-sentence report, those facts aren't true and here's why. And again, at sentencing, when counsel shows up and says, we disagree with the PSR, and of course the prosecutor agrees with the PSR, then that's the question of whether or not it's disputed, not whether or not there's some way to take the facts at trial and argue that they constitute an admission. I'd also point out, and again, I don't want to repeat my reply brief, but that when the government appeared in front of the sentencing judge, he had the opportunity at that time to say, hey, we don't need to dispute these two facts because they were conceded at trial. He did not say that in his papers or argue it below. He just invented that argument after we brought up the Emeline issue. So we say that there really isn't any believable, credible argument that there were admissions. Unless there are questions, I'll move on to the other portions of the argument. Why don't you go ahead and do that? Obviously, the primary reason we're here on appeal is because of the issue of sexual innuendo and of turning a prosecution over protective order into what essentially was a child molestation case. There's a lot of confusion in the record. I do think that the government has raised some significant waiver issues. I think that there are some questions when you go through the record as to exactly what was objected to and when. I obviously am taking the position that overall the issue is squarely before this court, and I think probably the strongest reason that it is is because of the verdict itself. This jury decided on the basis of 2262, this relatively new law, that the defendant boarded a plane in Texas with the intention of having an accidental meeting with this young boy in a Hawaii mall and approaching him on his bicycle. And, of course, we take the position that that allegation and that finding by the jury is so far-fetched that the reason this jury went the way they did is because of the sexual innuendos. It's only far-fetched if you load the word accidental with all of its potential meaning of totally unexpected. If, for example, when I fly home, I'm in Honolulu Airport, and I run into somebody I knew in high school for the first time in, I'm not going to say how many years, but many years, that would be accidental. But in this case, there is evidence in the record, I think, and you can correct me if I'm wrong about this, that he had spent, your client spent considerable time with Joshua while he was, while he, your client, was in Hawaii and visiting, and he knew where the kid hung out. And it's not such a far-fetched thing. I'm sorry, Your Honor. There's no evidence in the record that the defendant knew that this kid hung out at that mall. In fact, he was specifically asked during the direct examination whether or not he had ever been to the mall with Joshua and said he had not. Now, Joshua was not asked that question, but there's no evidence in the record that the two of them ever went to the mall. That's simply not fair. Well, he does not have to have ever gone to the mall himself. Of course, he might have lied as well. But, yeah, maybe I'm not saying the record is wrong. It's that the mall was some place where you could expect the kid to show up. If you wanted to run into my boys, let's say, there are only, there are a few places that I could tell you for sure you would easily find them if you hung out long enough at the Starbucks or the shopping mall. So these things are not such a mystery. There's a local movie theater and sometimes they hang out there. So it's not such a mystery where teenage boys or teenage boys and girls, I guess, are likely to be run into. It's not like a random place. And this was a mall. It's not an unlikely place to go, particularly near the house. It's not an unlikely place to accidentally run into somebody. Well, let's assume, I mean, you obviously argued that it was accidental. Yeah, and the prosecutor didn't argue otherwise. But even take out all the, you know, the prior, the evidence with the prior young man. Well, it's, you know, you can't entirely excise the relationship the two have had, the exchange of emails, you know, all of that. Certainly not. But also, too, you can't excise what happened at the time of the contact. Now, if something were accidental, you know, which I'm sure, you know, if I were prosecuting this case, how I would argue it, is you know you're under a restraining order. You accidentally run into someone that you know you're not supposed to see. That evidence of it's accidental would be that you would leave at that point as opposed to approaching the individual. Isn't there, I mean, he testified that he grabbed onto the steering wheel of his bike or something and tried to stop him and talk to him, right? That's correct. You know, all of the other arguments that you make, you can always make the argument that it's accidental, but you can't immunize him from what the circumstances of the encounter were for the jury to decide. That's correct. And he admitted that it was a violation to touch the handlebars. Well, and also, too, you have to accept that a jury is probably going to look at it. If it were accidental, what would I do when I know I'm under, you know, a restraining order? I would then say, oh, I can't talk to you and leave, as opposed to trying to pursue the contact further, grab onto the handlebars and, you know, that type of thing. I didn't argue that there was insufficient evidence, Your Honor, and I'm not arguing that. Well, I guess it's all intertwined in terms of when, if you're assessing prejudice as well, in terms of, let's say, if you're looking at the prior that came in with the other young man, in terms of that there had been contact with this individual, I think it was seven years previously, and there had, then let's just say that that was error, that it wasn't similar enough or something along those lines. But, I mean, you still have to look at prejudice of any type of error. I agree. I agree. And really the most significant thing is what's the evidence of the encounter besides, you know, what's the evidence that we're not disputing? And he still, unfortunately, has some fairly damning evidence to overcome. Well, I agree with all of that. I mean, I'm just saying that honestly to give you an opportunity to make your best argument. Yes. Okay. Let me say one more time, Your Honor. First of all, if you look at not only the argument that the prosecutor made at the motion in Limine, where he explained to the judge that he had to have the evidence of sexual intent in order to show intent. I mean, clearly that was his theory of the case. He did not argue in his closing argument after the whole trial was over that somehow he intended to run into a defendant at the shopping center. He never argued that. What he argued is that he had the intent in Texas to have some contact, not that particular contact, but some contact with a defendant, and that when he got to Hawaii, he, in fact, did have contact. He argued this statute in a very strange way. And if you look at the way he describes this statute. Mr. Gould was so persistent in trying to have contact with this young man, despite the parents saying, don't e-mail my child, change the e-mail address, don't do anything. I agree. I agree. I agree. And he still, no, but I've got to, you know, I've got to talk to him. That's clear. And he's how old? The defendant is 36. And 12-year-old. And 12. Yes. Okay. And even the, quote, accidental contact at the mall. Joshua said, I want to leave. The guy said, I want to speak to you for two minutes. And he grabbed the handlebars to keep Joshua from leaving. So even if we assume you're correct it was accidental, and along the same lines, when you assume that we agree the district court erred in allowing the coast to testify that they feared McNeil might be a pedophile. How is your client prejudiced by this admission, because his own e-mail to the coast, which was admitted as evidence, put the issue of whether the coast believed he had sexual intentions toward their children. Well, okay, that's sort of a two-part question, Your Honor. Let's start off with what the coast said. The coast did not say that he might be a pedophile. The coast said they thought, after seeing BoyGlove.com, that he was a pedophile. That's a big step difference. The argument was not that there's a possibility the defendant is a pedophile. The argument was repeatedly that he is. All right? But assuming that all it was was maybe he's a pedophile. As they believed he is. Well, that sounds like what the jury's being told is the coast thought he was a pedophile. You know, if you excise everything, when you have a 36-year-old man making this insistent contact with a 12-year-old, I can't believe that there would be anyone with an IQ above 50 that it wouldn't be crossing their mind that this person was, that they were a pedophile. So, you know, the prejudice is there by virtue of the behavior. Well, I mean, you know, as much as, you know, I appreciate your position. I obviously take very strong objection to that statement because I don't think that a 36-year-old hanging out with a 12-year-old is necessarily a pedophile. I mean, that's exactly the point we are making here. And if you're making that quantum leap, that's a, you know. No, I didn't say that. But, I mean, you kept emailing him. The parents said, I don't like you having contact. Well, there's no sexual contact whatsoever. The child was asked if he ever had any sexual aggression by this man whatsoever, and he said he did not. There's no evidence in this record whatsoever that there was a sexual... But you're forgetting, you're leaving out the bookmark on his computer to boylove.com. I'm leaving it out because the reason... But that's sort of the component. If you're a parent and you have this, of a teenage boy, and it would be strange enough for a 36-year-old man to be wanting to spend a lot of time with... I mean, that alone, you know, maybe those of us who are from big cities have more suspicious minds about those things. But I sure think boy love might be involved there, you know, something like that. But if he has a bookmark, you know, not just a website that he happens to have seen once, but something that he keeps as a bookmark on his computer, which means he goes back and sees it again and again, I think there would be little that could be done to convince me otherwise. Well, the judge ruled in her order granting the motion and limiting your honor that it was inappropriate and not inextricably connected, and also that it was highly prejudicial and violated 403. So you're sort of overruling her. I'd like to address Judge Nelson's question because I think it's a good one. I'm not saying your questions are not, but she did ask a question. We sort of moved on. She asked about the impact of the e-mails. You know, I tried to address that in my reply brief, Judge, and the position that we take is those e-mails were not admitted into evidence until after the prosecutor's opening statement and the Coe's testimony. And by the time that those e-mails were introduced, the defendant no longer took the position that they were inadmissible because those e-mails contained denials. Those e-mails and his testimony addressing these subjects all said, I have no sexual interest in this child. So those things came in afterwards. At the time that those were offered into evidence, the argument was already before the jury that boylove.com and the suggestion that he was a pedophile and the Taylor bond, all that stuff had already come in, been described in the opening statement, and even, by the way, described in the judge's so-called limiting instruction where she outlined what the testimony the jury was going to hear was and mentioned Brandy and Devin Coe and mentioned boylove.com. Before they even heard it from the Coe's, the judge said it. So all that was the cat out of the bag. And again, I understand this general perception in the community that maybe that when a 36-year-old hangs out with a 12-year-old obsessively that he's a pedophile. And that's exactly why this evidence was so dangerous and prejudicial in this case. As I pointed out in the opening brief, five or six jurors refused to serve because of that exact prejudice, Judge Callahan. You want to prove the evidence of the bookmark, but wasn't that in fact admissible? I'm sorry. It was a favorites list. It wasn't a bookmark. It was a favorites list computer site. And again, Your Honor, this judge ruled that it was inadmissible. She said that it should not be mentioned by name and that it was more prejudicial than probative and it happened two years before this incident and therefore it was irrelevant. That's what she said. She said 401, 403, and 404. Then she modified her ruling, and it's our position that the initial position she took was correct, but that when she dealt with it mid-trial and before the opening statement to the prosecutor, she changed her mind. Again, we're saying that the potential for prejudice in this case is huge. I asked you a simple question. I'm sorry. You mentioned it. Was the evidence of the bookmark or the favorites earlier in the call admitted before the jury? The evidence of boylove.com being on the favorites list and causing them to think he was a pedophile was the first testimony out of the Coe's mouth. Yes, of course it was. It was stated not only by the judge but also by the prosecutor. Okay, fine. So you keep leaving it out in your discussion, your summary, as if it didn't exist. In fact, it wasn't from the jury. So you're saying, oh, it's not so strange to have a 36-year-old man hang out with a 12-year-old boy obsessively. You know, I think it's pretty strange. I didn't say it wasn't strange, Your Honor. I realize it's suspicious. It's not the kind of thing I would want to have involved with any boys, you know, that I cared about. But that's my, you know. But when you add this additional fact that this guy goes on the Internet and looks at, I mean, I don't know what's on boylove.com, but I can imagine there are not a lot of bad bandicoots on there, huh? You just made my point. The jury imagined. You can't imagine, but the jury imagined. The jury filled in all the blanks. Once you give the name of the website and you ask the complaining witnesses what they thought after they saw it, and they say that he was a pedophile, it's a crime. I must confess, I did not go check it out. I did not go check it out. But, well, maybe you should have. But see, you don't need to, Your Honor. That's the point. It's a bunch of bandicoot, you know, things that boys love to play with, like GI Joe or something. If that's what it is, it seems to me that's, I mean. Let's go back to when he was charged with a crime. But the real idea is that boylove.com is probably exactly what it seems to be, which is probably a website involving a criminal. Well, I would like to go back to my question and make, I realize you're having a hard time trying to get a word in here, but let me just say, the name of the website was entered into evidence on two other occasions, neither of which you challenged. McNeil used the name of the website in his May 27, 2002 email to the Coe's, and the name of the website was also discussed during McNeil's May 22, 2002 conversation with Cathy Coe, which was recorded and played to the jury. And there was no objection at that time. So why is that so prejudicial then? Well, I'm sorry, Judge Nelson. I thought I just answered your question. That's the same question you just asked, which is in the emails, which is that the May 27 was an email. Yes. And the May 22 was the tape from the Chili's restaurant, which, by the way, as I mentioned in my reply brief, is not before this court, and therefore we shouldn't even be addressing it because it wasn't introduced into evidence. But those two pieces of evidence came in during the defense case, or later in the state's case, or the government's case. They came in after the judge had already allowed the prosecutor to stand up in opening statement and describe Devin and Brandy Coe seeing BoyLove.com on defendant's favorites list, and the Coe's decided that he was a pedophile. It was too late to do anything. It was too late. And those two documents you're referring to, Your Honor, are denial documents. In those documents, the defendant says, I'm not a pedophile. So that's why he did not object. But it was a done deal. It could certainly have been excised. Yes, it should have been. Well, the counsel can ask for that. I know that, but it was too late because it had already been put in. And so he denies. In that statement, he denies. It's not that the prosecutor stands up and says it. In fact, if the prosecutor stands up and says it, and then it's not presented by way of evidence. Well, then the Coe's. When the Coe's testified. Well, but that's when he should have objected. That's when he should have objected, and that's when it could have been excised or they could have been told not to talk about it. And if it doesn't come in, you can say, you know, the prosecutor stood up and promised you things at the beginning of the case. He said this would come in, and it didn't come in. Did you listen? Did you hear any evidence at this point? You can't avoid objecting to evidence because the prosecutor stands up and talks about it. I agree, but there was a motion in limine. There was a 32-page opposition memo by the prosecution. There was a long hearing on this whole discussion. They readdressed the discussion on the day before the opening statement. They had exhaustively discussed whether or not these witnesses could testify in this way, and the judge had said, yes, they can. Now, if Your Honor is saying that a motion in limine is not good enough, you should object when the evidence comes in as well. I agree. I was not trial counsel. This isn't a perfect record. I assume what the defense counsel thought was I've already objected until I'm blue in the face outside the presence of the jury. I don't want to emphasize this evidence in front of the jury, so I'm not going to object now. But she did make clear in a motion in limine. You're over your time. But I agree. Thank you. That the record could be clearer. Thank you. All right. Do I have any time left for rebuttal? Not at all. All right. We'll see what you think, Your Honor. Thank you. Good morning, Your Honor. This is Marshal Silverberg on behalf of the United States. Hi, Mr. Silverberg. Hi. Is there a particular place that you would like me to start? Is there anything in the record this morning that you don't think is adequately covered in your brief?  First of all, I would like to challenge their statement. I guess the answer is yes. They were not adequately covered in your brief. Okay. Go ahead. Why don't you limit yourself only to those things? Thank you, Your Honor. I'll do that. I'll be brief. Sufficiency of the evidence is not before this Court. No Rule 29 motion was ever filed, no motion for judgment or acquittal, either at the end of the government's case or at the end of the whole case. So that's not an issue. It was not raised in either the opening brief or the reply brief. So although there's been some discussion with opposing counsel, that was not an issue at court below or in the briefs. I never conceded, and I was to the trial counsel, that the meeting at the mall was accidental. In fact, to the contrary, I said, we don't know how it happened because the defendant didn't say he intentionally met him there, but that is not the same thing as we were conceding that was accidental. I mean, there's a million people on this island. And as the Court has pointed out, the only person he was not supposed to be around lived a mile away from this mall, and the defendant had just been at that mall with the victim's mother a few days before. So we don't concede that was accidental. The defendant knew that the parents went to the mall. He was just there three days before. He knew that the victim went to the mall because he had dinner there when he was here the year before. So, again, we never conceded that it was accidental. As to the whole issue that my opposing counsel was raising with the Web sites and the e-mail messages, at the final pretrial conference, before the trial even started, all those exhibits were placed into evidence. So we knew exactly, both Ms. Gray and I knew exactly when we went into opening statement what exhibits were in evidence and what wasn't. So this wasn't something that was sprung on opposing counsel. This played into their theory of the defense. And the theory of the defense was that the reason the defendant came out to Hawaii was because he was concerned that there was this perception that he was a pedophile. Tell me, Mr. Somerville, when in your view was the crime complete? The crime was not complete until he got on the plane. It wasn't in Texas. When the door closed and they say you can no longer talk on the cell phones, that's when the crime was completed, right? Or when the plane takes off from the ground when you no longer can leave the plane. Well, once the door closes, you can't leave the plane. I suppose if you make enough of a commotion, they might pull you off the plane. But once that door closes, it's gone. So at that point, the crime is complete. Well, let me let me back off a second. That's the point. The intent part is complete. But you still have to actually violate the protection order. So if he got to if he got on the plane with the intent to violate the protection order and then came to Hawaii and changed his mind and never saw the boy, never ran into him, or he tried to see the boy and he never ran into him, there wouldn't have been a crime. Because another element was that you actually violate the protection order. I see. So you have to have the intent to you have to travel to St. Thomas with intent, and then you actually have to go ahead and violate the order. Correct. So the crime then wasn't complete in your view, all elements, until he grabbed that bike? Well, it wasn't. When he came up to the boy at the mall, it wasn't complete until that point. So when he sees him, what was the protected word? A hundred feet? A hundred yards. A hundred yards. So when he sees him 150 yards away, he's still not committed the crime. Right. So it's only it's only when he approaches past that bubble. And that's why you argue all this stuff is relevant. The mall, the conversation with the mother. Okay. Right. I mean, those are the elements of the crime. The thing could have been solved without the emphasis on pedophilia, without all the pedophiles. Well, I don't see how they could have made their defense without, again, I never argued at all in opening or in closing that he was a pedophile. Not one word I ever say that. The only reason they came up at trial was that the codes had to explain why they got a protection order. Why? Why do they have to explain that? Why can't they simply, why can't the judge simply give an instruction saying, you know, there was a protective order in place, there was evidence of protective order, you must decide whether there was a protective order in place, or maybe the part you stipulated was a protective order in place, and you are not to speculate as to why there was a protective order, whether this was a displaced parent, I mean, estranged parent who was denied custody, and there's some dispute between mother and father, let's say. I mean, that happens a lot of the time. There's a big fight between mother and father, and one gets a protective order, one gets custody of children, and, in fact, the jury can be told, don't speculate as to why. The only thing you need to know is that there was a protective order, and that's all. The case could have been tried that way, couldn't it? And my guess is that the defense that accepted that, my guess, and I'm speculating, but my guess is Judge Aitken would have granted that. My point is they wanted to be able to bring out their defense, and their defense was the defendant got on that plane because he wanted to come out and correct the misperception, in his view, that he was a pedophile. And so you couldn't bring out, you can't correct the misperception of people thinking that you're one thing, that you're a pedophile, without bringing in the other side of the coin, did they think he was a pedophile. I don't know how you could bring it out one way without the other way. Along those lines, what is the probative value of the name of the website, boylove.com? Well, as Your Honor pointed out, it was in evidence already, in terms of the exhibits that were stipulated even before the trial began. The question is, what is the probative value? Probative value of it was to explain, as opposed to just saying some questionable website. Well, if the defense had asked for, you know, to excise, as I think Judge Kuczynski pointed out, to excise the e-mail in terms of the name, I mean, I don't know if you read the whole transcript I put in there. I actually tried to come up with another way of keeping in the name, but trying to take away any kind of pornographic connotation, and that's in the transcript of it. It's hard to do that. It's hard to do. Admittedly, it's hard to do. The mind goes in only one direction. That's right. But what the court did was it prohibited any mention from the content of the website, and that's really what the prejudice would have been. So the probative value was because in their own mind, the Coe's own mind, the name of the website is what led them to have this concern that he might be a pedophile. If you don't know the name, you don't know how they came up with that concern. Well, if he was a pedophile, it would be really probative that he would want to be around kids and that he was pursuing this relationship unnaturally and it wasn't accidental. The question is, is that more probative than it is prejudicial? But I never argued, not once, that he was a pedophile. I don't think on the facts of this you would even have to. I mean, I think people would, you know, I mean, I think the evidence did it for you. I don't think you had to say, I think you would never have to say the word pedophile for people not to think about it with all the evidence there. And as you pointed out, you know, I mean, I have a 12-year-old son and a 14-year-old daughter, and if someone has a favorites list, has this on their favorites list, there's no way they're coming near my kids. But these people were very trusting, and the defendant was the stepfather's cousin, Jim Coe's cousin, and they took a precaution. They allowed him to come out anyway despite knowing the name of the website. And what they did was they had Mrs. Coe's father be there as a chaperone, so he would never be alone with the boy. But, you know, what you're doing is, I think, and forgive me, I don't mean to come across the wrong way, but, I mean, we're sitting here second-guessing, well, we could have done this, we could have done that. These are all things that were never raised at trial. They never raised the possibility of trying to excise the e-mail message, excise the tape. What we wanted to do, and I think we had a right to do, and the defense lawyer admitted we had the right to do, was to put forth Mrs. Coe's testimony, Mr. Coe's testimony in a comprehensible form. Why did they get a protection order in order to establish why they had the police try and arrest them afterwards? This is a cousin. I mean, we didn't want the jury to think that these were irrational people who were going off the wall. And a lot of the e-mail messages from the defendant says, why are you doing this to me? And those were all coming into evidence. So it would have been blatantly unfair to us, we think, if he could have gotten out through the e-mail messages his theory of the case that they're irrational people without us putting forward the rational basis for their actions. I mean, as a prosecutor, you have to try and put forth a story. What happened and why did it happen in a way that will make sense to the jury? And if we had excised the name of BoyLove.com totally, then the jury would have been wound up, would have thought, you know, are these people just off the wall? Why are they so hard and harsh on this defendant who no doubt was a very intelligent guy? This wasn't somebody that, you know, was running around with a stick or a gun. This was somebody that was a bright. You know, I think you probably underestimate the jury. I think most jurors would realize that if some guy is obsessively wanting to see some 12-year-old kid, parents have very good reason to say no. I think you're probably selling the jury short. But in any event, is there anything further? No. Thank you very much.  Thank you. We'll give you a minute for rebuttal. Thank you, Your Honor. Just briefly, I want to focus the Court back on what the charge is. The charge is violation of a protective order. There's no, as I think Justice Callahan pointed out, there's no necessity to establish the reasons for the protective order. You don't have to prove that the parents were not irrational when they obtained it. The fact is Judge Fong issued a protective order. It was violated. The defendant acknowledged violating it. There really wasn't an issue in terms of this particular offense. And that was discussed by Judge Aiken, acknowledged by Judge Aiken, three or four times in the motion limiting. We are not here in a child molestation case. The government does not have to prove the reasons for getting the order. The issue of whether or not there was agreement to these documents before trial is not for the Court. There's no transcript to that hearing. I was not the trial counsel, but neither were you, and I object to reference to the pretrial proceedings because they were not recorded. I think the fact is those documents came in after the Coase testified. And, again, those documents included denials. I understand the Court's concern about the implicit issues in this case. They were there without having to put in boylove.com. It wasn't necessary, and it pushed this jury over the top. There was plenty of evidence to establish that he was obsessive and a very good reason for getting that order. If you look at Judge Fong's testimony, he doesn't deal with the boylove.com issue. All he dealt with is the obsessiveness, the repeated contacts. There was plenty enough to make the argument in a non-prejudicial way without it, which is why Judge Aiken said it was more prejudicial than probative, and then she changed her mind. Okay? Thank you. Thank you. Thank you. Thank you for a fine argument, counsel. The case is how you will stand for minutes. We are now going to be in recess for a few minutes while we reconstitute the panel, and we'll be back in not too many minutes, maybe five or ten. All rise. Thank you.
judges: D.W. Nelson, Kozinski, Callahan